JACK MILLER, JR. and ALICE W. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 208-74.
United States Tax Court
T.C. Memo 1976-162; 1976 Tax Ct. Memo LEXIS 241; 35 T.C.M. (CCH) 721; T.C.M. (RIA) 76162; May 24, 1976, Filed Allen E. Pye, for the petitioners. Kemble White, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined *242 the following deficiencies in the Federal income tax of petitioners: 1965
$ 4,244.44
1966
2,570.63
1967
3,255.67
1968
5,765.17
1969
27,683.36
1970
48,777.31 Owing to concessions, the remaining issue for our decision is whether Jack Miller, Jr.'s dominant motivation in guaranteeing the debts of three corporations in which petitioners owned stock, was to insure that the salary income which he earned as an employee of the three corporations would continue. FINDINGS OF FACT Incorporated in these findings are the stipulation of facts and exhibits appended thereto. Petitioners, husband and wife, filed a joint Federal income tax return for each year in issue at either Dallas or Austin, Texas. They were residents of Atlanta, Texas, when they filed their petition with this Court. In 1946 petitioners inaugurated a chicken hatching business in Atlanta, Texas. They operated the business as a sole proprietorship under the name of Atlanta Hatchery. In 1958, 1959 and the early part of 1960 petitioners expanded their hatching operation into a fully integrated poultry business which included the raising of broilers, the milling of feed and the production of *243 hatching eggs from hen flocks. On May 1, 1960, petitioners divided the several segments of their business among three corporate entities. They transferred the hatching operation to Piney Woods Hatchery (Piney Woods); the feed milling operation to Jack Miller Milling Corporation (Milling); and the broiler raising operation to A & J Investment Corporation (A & J). In exchange for these transfers petitioners received all of the shares of stock issued by each corporation. Petitioners' basis in the shares of Piney Woods was $23,000; in the shares of Milling was $16,300; and in the shares of A & J was $20,000. The aforesaid transfers were the only contributions which petitioner ever made to the capital of the three corporations. At all times relevant Jack Miller, Jr., was employed by the three corporations as their principal operating officer; Alice W. Miller was in the employ of the three corporations as well. Petitioners' employment by the three corporations was their only trade or business and until 1967, their only significant source of income. The combined amounts which petitioners received as compensation for services rendered to the three corporations during the years *244 1965 through 1970 were: $25,200; $24,600; $22,800; $20,100; $5,600 and $12,750. Jack suffered chronically from ill health which made it unlikely that he could obtain employment for comparable compensation elsewhere. On the average approximately 60,000 chickens were sold through the three corporations each week to various buyers in Texas and elsewhere. The market in which the chickens were sold was, however, very erratic; and the number of chickens actually sold from week to week varied markedly. In 1966 an opportunity to secure a stable outlet for the corporations presented itself. One Sam Hatcher contemplated the organization of a corporation to engage in the processing and sale of broilers. He wanted to finance the organization of the corporation (to be known as Golden Feast Poultry Corporation) with a loan from the Small Business Administration. To procure such a loan, however, Sam had to demonstrate that Golden Feast had a source from which an adequate number of broilers could be supplied. To insure Golden Feast of an adequate supply of broilers, Sam agreed to purchase 25 percent of petitioners' interest in the three corporations for $95,000. Additional purchases *245 by Sam of shares in the three corporations were discussed but never agreed to. Jack, on the other hand, was invited to join with Sam and Lonnie Pilgrim in organizing Golden Feast on January 4, 1966. Jack contributed $33,333.33 to the new corporation and received in exchange one-third of its stock: 133-1/3 shares, each having a par value of $1.00. Jack retained his equity interest in Golden Feast from the organization of the corporation until June 24, 1970. During that time he sought employment with the corporation on several occasions, but always without success. Golden Feast commenced operations in 1967. In contemplation of those operations, Jack, Sam and Lonnie entered into a contract with Golden Feast on January 18, 1967. The contract provided in pertinent part: 8 Jack Miller, Jr., agrees to offer for delivery a minimum of sixty thousand (60,000) birds per week to the processing plant leased to Golden Feast Poultry Corporation * * * for the first twelve months of its operation; and thereafter to offer for delivery a minimum of one hundred thousand (100,000) birds per week, with a tolerance of twenty thousand (20,000) birds from said hundred thousand figure. *246 9 Lonnie A. Pilgrim agrees to offer for delivery a minimum of one hundred thousand (100,000) birds per week, with a tolerance of twenty thousand (20,000) birds from said figure, to Golden Feast Poultry Corporation * * *. 10 Golden Feast Poultry Corporation agrees to pay for said birds as per formula agreed upon, based upon the average of the Texas, Georgia and Mississippi markets. In addition, Golden Feast Poultry Corporation will pay to Jack Miller, Jr., and Lonnie A. Pilgrim, transportation charges of seventy-five cents (75") per hundredweight on the birds delivered to the plant * * *. 11 In the event Jack Miller, Jr., fails to offer for delivery as many as fifty thousand (50,000) birds per week during the first twelve months of the plant's operation, then he shall, upon demand of Lonnie A. Pilgrim, assign to the said Lonnie A. Pilgrim, thirteen (13) shares of stock he owns in Golden Feast Poultry Corporation for each ten thousand (10,000) birds, or fraction thereof, he fails to offer for delivery during said time, under fifty thousand (50,000) per week. After the expiration of twelve months the said Jack Miller, Jr., shall assign, upon demand, thirteen shares of stock *247 he owns in said corporation for each ten thousand (10,000) birds or fraction thereof, he fails to offer for delivery under eighty thousand (80,000) birds per week. * * * 12 In the event the said Lonnie A. Pilgrim fails or refuses to offer for delivery as many as eighty thousand (80,000) birds per week, then and in that event he shall assign to Jack Miller, Jr., upon demand, thirteen (13) shares of stock he owns in Golden Feast Poultry Corporation, for each ten thousand (10,000) birds, or fraction thereof, he fails to offer for delivery during said time, under eighty thousand (80,000) per week. 13 After Golden Feast Poultry Corporation has operated the plant it has leased * * * for a period of twelve months, should either the said Jack Miller, Jr., or Lonnie A. Pilgrim, fail or refuse to offer for delivery as many as fifty thousand (50,000) birds per week, then and in that event such party in default shall sell all of the stock he owns back to the corporation. All sales of stock made in accordance with the above paragraphs shall be based upon the book value of such stock on the date of such default. * * *
16 This contract shall be a continuous term contract subject *248 to the rights of the parties to cancel as herein provided. * * *
18 Lonnie A. Pilgrim and Jack Miller, Jr., may elect at any time to return their stock to the corporation, and receive therefor the book value by giving six months written notice to said corporation, and at the end of said six months period of time their obligation to supply chickens to said corporation shall ipso facto terminate. It was principally through the three corporations that Jack supplied Golden Feast with broilers. To insure Jack of an adequate source of supply from which to meet his commitment to Golden Feast, the three corporations embarked upon a program of expansion. To finance this expansion they obtained a loan from the Atlanta National Bank in 1967. In 1967, coincidentally with the inauguration of Golden Feast's operations, the price of poultry began to decline. Therefore, although the three corporations now had a stable outlet, they incurred substantial losses. To remain in operation the three corporations had therefore to obtain additional loans from the Atlanta National Bank. The bank required that the repayment of the loans obtained by the three corporations be guaranteed by *249 their shareholders. Sam refused to give such a guaranty in view of the weak financial condition of the three corporations. It therefore remained for Jack to give the required guaranties. The bank further required that Jack pledge his Golden Feast stock, then worth $40,000, as security for the loans. The decline in poultry prices proved prolonged. To remain in operation the three corporations had to obtain from the bank additional loans which were guaranteed by Jack. By the end of 1969 the loans outstanding exceeded $350,000 in amount. Jack not only guaranteed obligations which the three corporations owed to the bank, but guaranteed obligations owing to other parties as well. Among these was an obligation to the H. A. Caesar Company, incurred in connection with purchases of pullets and breeding stocks. The H. A. Caesar Company sued Jack on his guarantee; and in January 1970 he paid $20,573.85 out of his personal funds in settlement of the suit. Unable to meet their various obligations, the three corporations filed petitions under Chapter XI of the bankruptcy statute on March 24, 1970. The arrangement, however, proved unworkable; and on October 24, 1973, motions were *250 filed by the three corporations that their assets be sold to satisfy their creditors. These motions were granted and unsecured creditors of the corporations were paid approximately 25 percent of their claims. On June 24, 1970, while the corporations were still operating under court supervision, the bank foreclosed its security interest in Jack's Golden Feast shares which were thereupon sold for $200,000. Golden Feast's taxable year ended on March 28 annually. For its taxable years ended March 28, 1968, 1969 and 1970, Golden Feast was an electing small business corporation within the meaning of sections 1371, etseq.[1] (Subchapter S), Internal Revenue Code of 1954, as amended. While he owned shares in Golden Feast Jack reported the following amounts as income from the corporation pursuant to Subchapter S: $20,107.85 in 1968, $136,371.28 in 1969 and $95,666.69 in 1970. When Jack's shares of Golden Feast stock were sold to satisfy the debts of the corporation in June 1970, his basis in the shares was $166,714.11. Of this amount $33,333.33 represented *251 Jack's original investment, and the balance of $133,380.78 represented Jack's pro rata shares of the undistributed taxable income [2]of the corporation. OPINION The parties are agreed that in 1970 when Jack honored his guaranties of the obligations of the three corporations, he sustained losses in the amount of $187,287.96 on the worthlessness of debts. . Petitioners contend that these losses were proximately related to Jack's trade or business; and that they were therefore deductible in full in the year in which they were sustained. Section 166(a)(1). [3]. At all times relevant Jack's only trade or business was his employment by the three corporations. Cf. . Petitioners' contention can be sustained only if Jack's dominant motivation in undertaking the commitments which occasioned the losses was to *252 insure that he would continue to derive a salary from that employment. ; , affd. . Respondent determined that the guaranties were undertaken to protect Jack's investment in Golden Feast; and that the losses occasioned by the guarantees were therefore deductible but only as short-term capital losses. ;, affd. per curiam, ; Section 166(d)(1). [4]
The issue presented is one of fact. . *253 The burden of proof is on petitioners. , affg. a Memorandum Opinion of this Court. At trial Jack testified without equivocation that his sole motivation in guaranteeing the obligations of the three corporations was to insure that his salary would be paid. Such testimony, standing alone, is not sufficient to support a decision in petitioners' favor. . We must base our decision as to Jack's motivation on reasonable inferences drawn from facts that have been established by the record. ; , affg. a Memorandum Opinion of this Court. Jack first guaranteed obligations of the three corporations in 1967. In that and previous years the salaries which the three corporations paid to petitioners were their only significant source of income. Had Jack failed to guarantee the obligations, operations of the three corporations would have ceased and with them, petitioners' salaries. In his state of health *254 Jack would have been hard put to find alternate gainful employment. These facts lend some credence to petitioners' contention; [5] and, in view of respondent's contention, they prompt us to ascertain whether when Jack guaranteed the obligations of the three corporations, he believed that his shares of stock in Golden Feast were a potential source of substantial income, and that his retention of those shares depended upon his guaranteeing the obligations of the three corporations. Cf. . Golden Feast inaugurated its broiler processing operation in 1967. Its taxable year ended on March 28 annually. For its taxable year ended March 28, 1968, 1969 and 1970 it was an electing small business corporation within the meaning of Subchapter S. Under the provisions of Subchapter S the shareholders of Golden Feast had to report, not only the amounts distributed to them out of the current earnings and profits of the corporations, but also the amounts which they would have received as dividends if on March 28 of each year, Golden Feast had distributed *255 to them pro rata, an amount equal to its undistributed taxable income for the taxable year of the corporation then closing. [6] Each shareholder's basis in his Golden Feast shares had to be increased by the amount of undistributed taxable income he was required to report. [7]
*256 While Jack remained among the shareholders of Golden Feast, he reported income in respect of his shares in the following amounts: $20,107.85 in 1968; $136,371.28 in 1969; and $95,666.69 in 1970. When Jack's shares were sold on June 24, 1970, his basis included $133,380.78 of undistributed taxable income. Prior to that date, therefore, distributions of $118,765.04 must have been made in respect of his shares. The distributions of $118,765.04 made with respect to Jack's shares in the period of approximately three years preceding the sale of the shares, substantially exceeded the salaries which petitioners received from the three corporations in any period of comparable duration, so far as can be ascertained from the record. In 1967 when Jack first guaranteed loans obtained by the three corporations, he could not have predicted the precise amounts which Golden Feast would distribute with respect to his shares in a three-year period. That he was generally optimistic as to Golden Feast's prospects is, however, evidenced by the fact that he expanded the facilities of the three corporations in anticipation of Golden Feast's demand for broilers. Furthermore, the amounts which were *257 distributed by Golden Feast with respect to Jack's shares are, in our opinion, some indication of the return which he must have expected to realize on the investment. In 1967, therefore, Jack must have anticipated that his investment in Golden Feast would equal if not surpass employment by the three corporations as a source of income. Such expectations were proven justified by events in 1968 and 1969 as Jack committed himself increasingly on the obligations of the three corporations. Jack's realization of the superiority of Golden Feast over the three corporations as a source of income on which to rely is evidenced by the fact that on several occasions he sought employment with Golden Feast. Sam Hatcher invested in the three corporations and invited Jack to participate in Golden Feast on the assumption that Golden Feast would be supplied with broilers through the three corporations. The contract of January 18, 1967, was concluded pursuant to that design; and most of the broilers which Jack supplied to Golden Feast in compliance with that contract were obtained through the three corporations. Petitioners assert that the three corporations were not the only source from which *258 Jack might have obtained the broilers needed to supply Golden Feast. Had there, however, been alternate sources from which Jack might have obtained the broilers practicably, we are certain that he would have availed himself of them rather than rely on the three corporations. For it was while supplying Jack with broilers to comply with the contract of January 18, 1967, that the three corporations incurred certain of the obligations which Jack guaranteed. From this we conclude that had Jack failed to guarantee the obligations and the three corporations folded as a result, not only would petitioners have lost their salaries, but Jack would have been unable to supply Golden Feast with broilers. Consequently, he would either have forfeited a portion of his investment in Golden Feast pursuant to paragraph 11 of the contract of January 18, 1967, or have had to sell his investment back to the corporations at book value pursuant to paragraph 18 of the said contract. A prolonged and careful review of the record compiled in connection with this controversy discloses that the weight of objective evidence supports respondent's contention. It appears that when Jack was guaranteeing the *259 obligations of the three corporations, he expected to derive substantial amounts of income from his investment in Golden Feast and realized that his retention of that investment depended upon the continued operation of the three corporations. At that same time the three corporations were proving unsatisfactory as a source of income. This being the case, it is abundantly clear that petitioners have not sustained their burden of proving that Jack's dominant motivation in guaranteeing the obligations of the three corporations was to insure their continued payment of salaries. Accordingly, the issue presented is resolved in favor of respondent. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. See sec. 1373.↩
3. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts. --There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩
4. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts. -- (1) General rule. --In the case of a taxpayer other than a corporation-- (A) subsections (a) * * * shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩
5. .↩
6. SEC. 1373. CORPORATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS. (a) General Rule. --The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) Amount Included in Gross Income. --Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation. ↩
7. SEC. 1376. ADJUSTMENT TO BASIS OF STOCK OF, AND INDEBTEDNESS OWING, SHAREHOLDERS. (a) Increase in Basis of Stock for Amounts Treated as Dividends. --The basis of a shareholder's stock in an electing small business corporation shall be increased by the amount required to be included in the gross income of such shareholder under section 1373(b), but only to the extent to which such amount is included in his gross income in his return, increased or decreased by any adjustment of such amount in any redetermination of the shareholder's tax liability.↩